**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ANDREW H. LOWE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      Civil Action No. 11-1944 (RMC) |
| | ) |
| LISA P. JACKSON, Administrator, | ) |
| U.S. Environmental Protection Agency, | ) |
| | ) |
| Defendant. | ) |

## OPINION

Andrew H. Lowe, a deaf Chinese-American male, sues the Environmental

Protection Agency (EPA), for alleged employment discrimination on the basis of race,

national origin, and disability, retaliation for his participation in protected activities, and a

hostile work environment. Lisa Jackson, Administrator of EPA, responds that any

adverse actions suffered by Mr. Lowe were legitimate and precipitated by his

unwillingness to take direction from his supervisors and untimely completion of

assignments. EPA moves for summary judgment. The Court will grant the motion in

part and deny it in part. Mr. Lowe has offered direct evidence of discrimination based on

his disability and evidence of retaliation that must be evaluated by a jury.

## I. FACTS

Andrew H. Lowe is a sixty-two-year-old Asian American male of Chinese

descent. At the age of thirteen, Mr. Lowe's hearing was destroyed by ototoxicity and he

now relies on sign language and written communication to interact with co-workers and

supervisors. *See* Pl. Ex. 1 (Lowe Decl.) [Dkt. 32-1] ¶ 1; Opp'n [Dkt. 33] at 8.[1]  He began

his career with EPA in 1987 as a GS–9 Computer Specialist in the Office of Air and

Radiation.  Lowe Decl. ¶ 3.  During his tenure with EPA, Mr. Lowe earned a Master's

Degree in Information Assurance from the University of Maryland.  *Id.* ¶ 2.  He

continued his federal employment with EPA until his termination in May 2010.

 In January 2001, Mr. Lowe transferred to EPA's Office of Environmental

Information (OEI) as a GS–13 Information Technology Specialist.  Opp'n at 5.  During

that time, OEI was headed by Director Mark Luttner and Deputy Director Andrew Battin.

Def. Facts [Dkt. 27-1] ¶ 4.  OEI has several component divisions, including the

Information Exchange and Services Division, which was supervised by Director Doreen

Sterling.  *Id.* ¶¶ 3–4.  The Information Exchange and Services Division is, in turn,

supported by multiple branches, including the Information Services and Support Branch

(ISSB).  *Id.* ¶ 3.  Mr. Lowe was assigned to ISSB and was directly supervised by Connie

Dwyer.  Opp'n at 5.

 In June 2005, Steve Vineski, a Caucasian male GS–14 Information

Security Officer in ISSB, moved to another office and recommended that Mr. Lowe

assume his information security position.  *Id.*; Am. Compl. [Dkt. 17] ¶ 11.  Mr. Lowe

accepted, and EPA amended his Performance Appraisal and Recognition System (PARS)

to reflect Mr. Lowe's duties as the Information Security Officer, as well as "the branch

technical lead/project manager on information security, and [on] various branch

_____

[1] The page numbers listed in this Opinion are consistent with those supplied by the
electronic case filing (ECF) system.

projects." Def. Facts ¶ 7; Def. Ex. ROI 1[2] Tab F, Ex. 48 (Lowe PARS Plan) [Dkt. 29-15] at 16. Although the information security position was located within ISSB, it appears to have served the entire Information Exchange and Services Division. *See* Lowe PARS Plan at 16. Mr. Lowe contends that when he became the Information Security Officer, "rebuilding the office's information security infrastructure demanded 100% of his government duty time, as reflected in his weekly check-in summaries presented to his supervisors." Am. Compl. ¶ 10; *see* Lowe Decl. ¶ 5 ("Mr. Vineski told me that it would be a full time job to fully satisfy the [information security] requirements."). EPA contends that information security was never meant to consume all of Mr. Lowe's time, and that he also was responsible for completing other tasks in support of ISSB. *See* Def. Facts ¶ 6. In contrast, Mr. Lowe contends that EPA managers failed to appreciate the time required to perform information security tasks for sixteen systems. *See* Opp'n at 7–9.

## A. Mr. Lowe's GS-14 Promotion and Transfer to the Front Office Requests

Mr. Lowe worked as a GS–13 Information Security Officer for several years, during which he "became aware that other [Information Security Officers] were working at the Grade 14 level." *Id.* at 1; Lowe Decl. ¶ 5 ("I found out that other [security officers] who shared the same responsibilities and [were] on the same organizational level . . . were either GS–14's or GS–15's."). In February 2007, Mr. Lowe asked Mr. Leopard for a promotion to a GS–14 Information Security Officer position, requested that his position description be revised to reflect that he was exclusively devoted to

---

[2] The Court references Defendant's exhibits according to the name and acronym conventions provided on the docket.

information security duties, and asked that he be moved to the front office of EPA's Office of Environmental Information.[3]  Def. Facts ¶¶ 8–9, 11.

Mr. Lowe's request for a GS–14 promotion was governed, in part, by a collective bargaining agreement between EPA and the American Federation of Government Employees (AFGE).  That contract provided two methods for promotion: (1) an employee could compete for a vacant position, or (2) an employee's current position could be reclassified at a higher grade level due to an accretion of duties.  *Id.* ¶ 25.  It is undisputed that there were no GS–14 vacancies in the ISSB branch at the relevant time.  Instead, Mr. Lowe requested that Mr. Leopard upgrade his position due to the predominance of his information security work, which he perceived to be at the GS–14 level.

Mr. Leopard responded in April 2007 and denied each of Mr. Lowe's requests.[4]  *Id.* ¶¶ 12–14.  Mr. Lowe then submitted his request to Division Director Doreen Sterling in July 2007, but she, too, denied all three proposals on July 23, 2007.  *Id.* ¶¶ 15, 17.

On October 22, 2007, Mr. Lowe met with Office Director Mark Luttner, again requesting a promotion, a revised position description, and relocation to the front office.  Mr. Luttner responded by email on November 9, 2007, stating: "I believe that [your] position is appropriately graded.  However, EPA employees may request desk

---

[3] Mr. Lowe never expressly describes the significance of being moved to the front office of EPA's Office of Environmental Information, but Mr. Lowe presumably requested a transfer due to the number of higher-graded EPA employees in the front office.

[4] While Mr. Lowe generally describes the same series of events, he disputes that Mr. Leopard and Ms. Sterling had the authority to approve or deny his requests.  *See, e.g.*, Pl. Facts [Dkt. 33-1] at 6 ("As a Branch Chief, [Mr.] Leopard had no ability to move [Mr.] Lowe to the staff of OIC.").  It is unnecessary to resolve this dispute.

audits if they have concerns about their positions. You may contact the Office of Human Resources to begin that process." *Id.* ¶ 20.

EPA contends that Mr. Lowe sent an email requesting a desk audit, but never submitted the necessary paperwork. *Id.* ¶ 21. To the contrary, Mr. Lowe avers that he submitted the desk audit paperwork, but Mr. Leopard failed to forward his request to the Office of Human Resources. Pl. Facts at 8–9. According to Mr. Lowe, he did not become aware that Mr. Leopard had failed to forward his paperwork until he already had filed an equal employment opportunity (EEO) complaint, and his managers had "made it clear that they would not support him." *Id.* at 9. There was never a desk audit of Mr. Lowe's job and he remained at the GS–13 level.

**B. Mr. Kyle's Assignment of Branch-Related Tasks**

By February 2009, there had been several changes in EPA's mid-level management. Mr. Leopard, former chief of ISSB, had been replaced by Lee Kyle; Division Director Sterling had retired; and Lisa Schlosser had succeeded Mark Luttner as Director of OEI. Def. Facts ¶ 22. On February 19, 2009, Mr. Kyle, Ms. Schlosser, and Mr. Battin met with Mr. Lowe, and Mr. Lowe informed them that eighty percent of his time was focused on information security duties. Mr. Lowe also requested again to be relocated to the front office as a GS–14 Information Security Officer. *Id.* ¶ 23. Ms. Schlosser denied Mr. Lowe's requests and reversed his priorities, directing him to reassess his workload with a goal of eighty percent project work, *i.e.*, duties in support of the branch, and no more than twenty percent information security work, *id.* ¶ 24. She also directed Mr. Kyle to help Mr. Lowe determine how best to divide his time between branch and information security assignments. *Id.*

In furtherance of this new priority scheme, on March 11, 2009, Mr. Kyle sent Mr. Lowe an assignment to support ISSB. By email, Mr. Kyle directed Mr. Lowe to "evaluate opportunities for adding geospatial capabilities to mobile devices." *Id.* ¶ 30. Mr. Kyle explained:

> We've been tasked to evaluate the potential benefits of adding geospatial capabilities to mobile devices, in order to flow EPA data on regulated data, permits and inspections. Toward[] this end, I'd like you to look at needs for this technology across the Agency. I'd also like you to search for specific programs and existing applications/tools where this technology could be implemented . . . . Your goal is to research these needs generically, identify specific examples of potential application, and [] report your findings in a vision paper that includes recommendations for moving forward . . . . After we agree on a project plan, my initial thinking is that I'd like to see your report within [eight] weeks.

*Id.* While EPA states that, "over a two month period[,] [Mr. Lowe] had emailed only one Region about their use of mobile devices, and that . . . email had only been sent on May 20, 2009, " *id.* ¶ 33, Mr. Lowe avers that he "reviewed application software and EPA policies for regulatory data access, talked to colleagues in the Office of Information Access and Analysis . . . . , researched online," and met with several field inspectors regarding mobile application technology in that time period, Pl. Facts at 10–11.

Mr. Lowe submitted a paper titled "Response to Project Request on Potential Uses of Mobile Devices (UMD), Location-Based Services and Applications" on May 26, 2009. In his response, Mr. Lowe wrote:

> After going through a substantial amount of investigation and deep thinking through the last eight weeks, I have to respectfully decline the request. In the meantime, I . . . propose a modified project that I have the expertise, confidence, interest and motivation to execute. Rationale:

> *A. Inadequate understanding of mobile device usage* [with seven explanatory paragraphs].

> *B. Inadequate understanding of rapid changes of technology and survey effectiveness* [with one explanatory paragraph].

Pl. Ex. 16 (Lowe Response to Mobile Devices Project) [Dkt. 32-16] at 3–4.

In essence, Mr. Lowe was concerned that EPA employees would not await a detailed study before obtaining electronics that could improve their work efficiency. *Id.* at 4. From his observations and attendance at an EPA Information Technology Conference, he concluded that, "[o]utside the agency, it is seriously doubtful that one would resort to consumer-grade mobile devices to perform geospatial data analysis or management. First, the screen, the [central processing unit] and the keyboard[,] etc., are simply too small to support the functionality; second, no serious users would endorse the security safeguards." *Id.* Mr. Lowe submitted a revised response to the mobile devices project on June 16, 2009. Def. Facts ¶ 35. The parties dispute whether Mr. Kyle told Mr. Lowe that his submissions were inadequate or whether he failed to review the submissions and provide Mr. Lowe with feedback. However, at a July 23, 2009 meeting, Mr. Lowe said that he could not devote more time to the project because his information security duties required eighty percent of his time, and he did not think that he was the right person for the task. *Id.* ¶ 36.

Mr. Kyle "insist[ed]" that Mr. Lowe complete the mobile devices assignment. Am. Compl. ¶ 15. Mr. Kyle also consulted with an EPA labor relations specialist, who informed him that EPA needed to update Mr. Lowe's performance standards to specify that his information security duties should take only twenty percent of his time. Def. Facts ¶ 38. Thereafter, on August 8, 2009, Mr. Kyle amended Mr.

Lowe's performance standards. *Id.* ¶ 39. On Critical Element Four, Information Security, he deleted the statement that approximately fifty percent of Mr. Lowe's time would be allocated to information security duties. *See* Pl. Ex. 9 (2009 Revised Performance Plan) [Dkt. 32-9] at 7. He also inserted a new criterion that transformed the mobile devices project into a critical element for purposes of evaluating Mr. Lowe's job performance. *Id.* at 8; Def. Facts ¶ 39.

Tensions continued to escalate between Messrs. Lowe and Kyle with respect to the mobile devices project. While Mr. Kyle initially seemed to approve the use of an email survey to ascertain Global Positioning System (GPS) uses by EPA employees, *see* Pl. Ex. 17 (July 1, 2009 Kyle Email) [Dkt. 32-17] at 1, he later refused to follow that course, *see* Pl. Facts at 13. Mr. Lowe argues that, in August 2009, he was "forced to use a focus group . . . because [Mr.] Kyle would not allow him to send an email or conduct a written survey to solicit such information from potential users." *Id.* Mr. Kyle's alleged insistence on a focus group was especially problematic for Mr. Lowe because, as a deaf employee, he needed to watch a sign language translator and therefore could not take notes or watch the participants as they spoke. The focus group ultimately proved to be an ineffective method, as the second meeting was significantly hampered by a failed teleconference arrangement.

On November 20, 2009, Pat Garvey, the manager of EPA's Facility Registries System (FRS) database, sent Mr. Kyle an email requesting staff assistance to review and clear duplicate records from the database. Mr. Kyle forwarded this request to Mr. Lowe, stating, "Andy, this could be a very useful project. I'm roughly estimating it should take [ten percent] of your time. Let's discuss, thanks." Def. Ex. MSPB 4KKK

(Nov. 20, 2009 FRS Assignment Email) [Dkt. 28-10] at 1.  Mr. Lowe responded that
"[s]uch low-level coding work must be done by [a] contractor.  I will be happy to
examine the issues . . . .  If you want me to do the micro-coding, no way.  No other
[Information Security Officer] would do that kind of work."  *Id.*  Mr. Lowe alleges that
Mr. Kyle asked Mr. Garvey to send the email so that he could assign Mr. Lowe to a
menial task.  *See* Pl. Facts at 15.

### C.  Mr. Lowe's Unsatisfactory Rating and Performance Improvement Plan

On November 12, 2009, three months and four days after he changed Mr.
Lowe's Critical Elements, Mr. Kyle rated Mr. Lowe "Unsatisfactory" under Critical
Element One, Work Products, and Critical Element Five, Support ISSB Geospatial
Services.  Pl. Ex. 28 (2009 PARS Interim Rating) [Dkt. 32-28] at 1.  As a result of these
two ratings, on December 4, 2009, Mr. Kyle informed Mr. Lowe that his overall PARS
rating was unsatisfactory, and he placed Mr. Lowe on a Performance Improvement Plan
(PIP), which gave Mr. Lowe seventy-five calendar days to bring his performance to the
"Fully Satisfactory" level.  Def. Facts ¶¶ 51–54.  During the seventy-five-day period, the
PIP required Mr. Lowe to complete: (1) the Geospatial Applications Project, *i.e.*, the
mobile devices project; (2) the review and correction of data in EPA's FRS database; and
(3) the preparation of two calendars to identify the information security deadlines that
Mr. Lowe faced in the upcoming year.  *Id.* ¶ 53.  The PIP further provided that "[Mr.]
Lowe needed to devote between [forty and fifty percent] of his time [to] non-[information
security] . . . projects that support the branch."  *Id.* ¶ 54.

Mr. Lowe voiced his objections to the various assignments included in the
PIP during a December 4, 2009 meeting.  He complained that the mobile devices project

did not "respect[] [his] expertise," the FRS data clean-up was "beneath [his] level of expertise," and the calendars were "routine work." *Id.* ¶¶ 55–57. Mr. Lowe believed that he already was performing his duties, and Mr. Kyle had purposely assigned three projects that were "outside . . . his experience and . . . particularly difficult for him given his age and his inability to hear and speak to his colleagues." Pl. Facts at 2. Mr. Lowe was frustrated because "[Mr.] Kyle added these . . . projects without taking away any of Mr. Lowe's [information security] duties, which was itself a full time job," and Mr. Lowe did not believe "there was [any] business need for these assignments." *Id.* Mr. Kyle explained how the assignments would support ISSB and the PIP remained in effect.

On December 8, 2009, Mr. Lowe attended a FRS data clean-up meeting with Mr. Garvey. On that same day, Mr. Garvey sent an email to Mr. Kyle, expressing his annoyance: "This was a disaster. [Mr. Lowe] did not want to be there, he did not want to do FRS direct work and felt no interest [in helping] out. He wanted it done by summer interns. We only did about [two] minutes of instruction before he said he wanted out." Def. Ex. MSPB 4GG (Dec. 8, 2009 Garvey Email) [Dkt. 28-4]. Mr. Kyle issued a Letter of Warning to Mr. Lowe on December 11, 2009, to reprimand Mr. Lowe informally for his behavior during the FRS training session. Def. Facts ¶ 59.

Almost one week later, Mr. Lowe complained that he could not complete the FRS data clean-up project because he was "over 60 [years old], had high-level short-sightedness, and . . . had received a warning from [his] doctor that [he] may be developing cataracts." *Id.* ¶ 62. Mr. Kyle sent Mr. Lowe an email outlining the procedures for seeking a reasonable accommodation. *Id.* Mr. Lowe then met with William Haig, EPA's National Reasonable Accommodation Coordinator, who reported

that Mr. Lowe had stated that "the medical condition that affects his eyes does not constitute a disability. Therefore, he is not, at this time, requesting a reasonable accommodation due to this medical condition." *Id.* ¶ 63 (internal alterations omitted). However, as Mr. Lowe then reported, he could not timely complete the FRS data clean-up project because Mr. Garvey had not provided a password to the database until several weeks after the project had been assigned. *See* Pl. Ex. 40 (Jan. 25, 2010 Lowe Email) [Dkt. 32-40]. When Mr. Lowe finally received full access to the FRS database, the system indicated that the assigned duplicates had already been reviewed and cleared by contractors. Opp'n at 26. Mr. Lowe informed Mr. Kyle that the duplicates had been cleared, and Mr. Kyle responded by directing the contractors to stop clearing duplicates so that Mr. Lowe could finish the project. *Id.* at 26–27. On February 17, 2010, Mr. Lowe requested an extension to clear newly assigned duplicates. *Id.* at 27. Mr. Kyle did not respond to Mr. Lowe's request, but instead "instructed the contractor to correct the duplicates before Mr. Lowe could get to them." *Id.*

Mr. Kyle exhibited increasing frustration with Mr. Lowe's performance between December 2009 and March 2010. The parties dispute whether Mr. Lowe made a good faith effort to complete the PIP assignments on a timely basis; the record indicates that Mr. Kyle extended several deadlines and that Mr. Lowe submitted multiple revised work products. Mr. Lowe justified many of the delays by noting that "the [information security] role consumed [his] time." Def. Ex. MSPB 4Y (Jan. 28, 2010 Weekly Check-In Meeting Notes) [Dkt. 28-27] at 12. While Mr. Lowe was on a PIP, Mr. Kyle maintained a log of work events, meetings, and employee progress concerning Mr. Lowe. *See* Pl. Ex. 4 [Dkt. 32-4]. On January 6, 2010, Mr. Kyle wrote in his log that "[m]ost people try

to work around [Mr. Lowe]. When he gets involved[,] things get more complicated." *Id.* at 2.

Messrs. Lowe and Kyle held a final meeting on March 2, 2010, for Mr. Lowe to discuss his work performance under the PIP. Am. Compl. ¶ 23; Def. Facts ¶ 100. Mr. Lowe was ready to describe his accomplishments with respect to information security and his efforts on the other assignments. However, Mr. Kyle expressed his dissatisfaction with Mr. Lowe's performance on each non-information security project under the PIP without any reference to his information security duties. Mr. Lowe refuted Mr. Kyle's charge of unsatisfactory performance, and reiterated that most of his time was consumed by urgent security tasks. Def. Facts ¶ 100; Pl. Facts at 21–22.

Mr. Lowe received notification of proposed removal for unacceptable performance under Critical Element One, Work Products, and Critical Element Five, Support ISSB Geospatial Services, on March 3, 2010. Def. Facts ¶ 101. EPA immediately placed Mr. Lowe on paid administrative leave. *Id.* Mr. Lowe responded in writing on April 1, 2010, and he and his union representatives made an oral presentation to the Deputy Director of EPA's Office of Environmental Information, Andrew Battin, one week later. *Id.* ¶ 102. On May 7, 2010, Mr. Battin issued a final decision finding Mr. Lowe's performance unacceptable under Critical Element One based on his work product for each assignment under the PIP. Mr. Battin also found Mr. Lowe's performance unacceptable under Critical Element Five based on his submissions for the mobile devices project. Mr. Lowe was fired from EPA as of May 14, 2010. *Id.* ¶ 103.

### D. Procedural History

Mr. Lowe first made contact with an EEO counselor on November 29, 2007,[5] alleging discriminatory treatment based on, *inter alia*, EPA's refusal to promote him to the GS–14 level, denial of his request to transfer to the front office, and refusal to update his position description to reflect his information security duties. EEO Counselor's Report at 2, 23. He also alleged retaliatory treatment based on EPA management's heightened scrutiny of his work product after he first contacted an EEO counselor. *Id.* at 2. After conciliation failed, Mr. Lowe was authorized on January 25, 2008, to file an in-agency formal administrative complaint within fifteen days. *Id.* at 27.

Mr. Lowe filed his first formal in-agency EEO complaint (EPA No. 2008-0030-HQ) on February 8, 2008. He alleged that he had suffered discrimination, retaliation, and a hostile work environment due to EPA's refusal to promote him to a GS–14 information security position, denial of his request to transfer to the front office, refusal to revise his position description, rating him as "Fully Successful" in an interim evaluation on January 25, 2008, and increasing scrutiny of his work product. Def. Ex. ROI 1, Tab A (Feb. 8, 2008 EEO Complaint) [Dkt. 29-3] at 4–6. After administrative investigation, consideration, and evaluation by EPA and the Office of Federal Operations (OFO) at the Equal Employment Opportunity Commission (EEOC), Mr. Lowe received a final agency decision denying his claims on February 17, 2012.

---

[5] EPA noted that Mr. Lowe made contact with an EEO counselor on either November 13, 2007 or November 29, 2007, but the agency failed to attach any document corroborating the November 13, 2007 date. *See* Mot. for Summ. J. [Dkt. 27] at 9. Mr. Lowe neglected to address this issue in opposition. The EEO Counselor's report indicates that Mr. Lowe first made contact on November 29, 2007. Def. Ex. ROI 1, Tab B (EEO Counselor's Report) [Dkt. 29-4] at 2.

Mr. Lowe filed a second EEO complaint (EPA No. 2010-0027) on January 7, 2010, alleging discrimination on the basis of race, national origin, and disability; retaliation for his prior protected EEO activities; and a hostile work environment. Am. Compl. ¶ 4(b). This complaint included allegations related to, among other incidents, Mr. Kyle's Letter of Warning, his unsatisfactory performance review in November 2009, and Mr. Lowe's placement on a PIP. *Id.* EPA issued a decision denying each of Mr. Lowe's claims in complaint EPA No. 2010-0027 on August 6, 2011. *See id.* Mr. Lowe filed a timely appeal to EEOC OFO pursuant to 29 C.F.R. § 1614.401(a), and he notified EEOC on October 14, 2011 that he intended to pursue a lawsuit in federal court. *See* 29 C.F.R. § 1614.407(b) (allowing 180 days for EEOC consideration of an appeal and then allowing a charging party to file suit). Mr. Lowe also appealed EPA's termination decision to the Merit Systems Protection Board (MSPB), which denied his claim.[6] *See* Am. Compl. ¶ 4(c).

Mr. Lowe filed the instant lawsuit on November 4, 2011, within thirty days of his receipt of EEOC OFO's decision. *See* Compl. [Dkt. 1]. On April 16, 2012, Mr. Lowe filed his Amended Complaint, which alleges violations of Title VII, the Rehabilitation Act, 29 U.S.C. §§ 701–18, and the Civil Service Reform Act, 5 U.S.C. § 7703(b)(2). Am. Compl. [Dkt. 17]. Mr. Lowe specifically alleges discrimination on the basis of race, national origin, and disability because EPA (1) refused to promote him to a GS–14 position; (2) refused to pay him at the GS–14 grade for his information

---

[6] Mr. Lowe attempts to sue MSPB and EEOC OFO for arbitrary and capricious agency action here, but these claims are subsumed by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See* 5 U.S.C. § 7703(b)(2) (termination decisions involving alleged discrimination "shall be filed under [Title VII] of the Civil Rights Act of 1964 . . . ."); *Chandler v. Roudebush*, 425 U.S. 840, 861–64 (1976) (holding that federal employees enjoy a right to *de novo* trial of Title VII claims).

security work; (3) subjected him to a hostile work environment; and (4) refused to update his position description to reflect his information security tasks. Am. Compl. ¶ 26. He further alleges discrimination on the same bases, as well as retaliation for prior protected activities, because EPA (1) denied his transfer request to the front office; (2) refused to assign him additional GS–14 responsibilities; (3) rated his performance "Fully Successful" in 2007; (4) rated his performance as unsatisfactory in 2009; (5) subjected his work product to heightened scrutiny; (6) failed to grant him performance awards; (7) failed to provide a sign language interpreter;[7] (8) placed him on a PIP; (9) claimed that he failed his PIP; and (10) terminated his employment. *Id.* ¶ 27.

## II. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 56

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[7] Mr. Lowe alleges that EPA failed to provide a sign language interpreter for meetings and failed to grant him performance awards, but offers no facts concerning these claims in his Amended Complaint or in opposition to EPA's Motion for Summary Judgment. EPA construes Mr. Lowe's allegations as referring to the agency's failure to provide Mr. Lowe with performance awards from 2003 to 2005, and again in 2008. Mot. for Summ. J. at 45–46; *see* Def. Ex. ROI 1, Tab F, Ex. 1 (July 11, 2008 EEO Memorandum) [Dkt. 29-5] at 13–14.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, if the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

### B. Title VII of the Civil Rights Act of 1964

Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2. Title VII also prohibits retaliation against an employee for engaging in protected EEO activity.[8] 42 U.S.C. § 2000e–3(a).

To survive summary judgment, a plaintiff can prove discrimination by offering direct evidence or, in the alternative, relying on circumstantial evidence. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716–17 (1983). Where a plaintiff offers direct evidence of discrimination, a court in this Circuit will ordinarily deny summary judgment and proceed to trial. *See Stone v. Landis Constr. Corp.*, 442 F. App'x 568, 569 (D.C. Cir. 2011) (citing *Swierkiewicz v. Sorema*, 534 U.S. 506, 511 (2002)). "Discriminatory statements by a decision-maker in the context of the decisional process are direct evidence of discrimination, and relieve the plaintiff of adherence to the *McDonnell Douglas* framework." *Pederson v. Mills*, 636 F. Supp. 2d 78, 83 (D.D.C. 2009) (citing *Thomas v. Nat'l Football League Players Ass'n*, 131 F.3d 198, 203–04

---

[8] Title VII speaks of retaliation as a form of discrimination. 42 U.S.C. § 2000e–3(a). The Court refers to "discrimination" as the "antidiscrimination provision [of Title VII]," (*i.e.*, discrimination based on race, color, religion, sex, or national origin), *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006), and "retaliation" as discrimination based upon an employee engaging in protected activity, 42 U.S.C. § 2000e–3(a).

(D.C. Cir. 1997)).

In the absence of direct discrimination, the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), may apply. Under that framework, a plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. *Id.* at 802. If the plaintiff succeeds, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its conduct. *Id.* at 802–03. "If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).

Once an employer articulates a legitimate, non-discriminatory reason, "the prima-facie-case aspect of *McDonnell Douglas* [becomes] irrelevant." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). At that point, "the district court must conduct one central inquiry in considering an employer's motion for summary judgment . . . [*i.e.*,] whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Id.* To "'survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.'" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (quoting *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)) (other citation omitted). "All relevant evidence" includes, *inter alia*, evidence of the plaintiff's

*prima facie* case and evidence indicating the employer's proffered reasons to be false, as well as evidence presented by the defendant. *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008); *Adeyemi*, 525 F.3d at 1227. "[B]are allegations of discrimination are insufficient to defeat a properly supported motion for summary judgment." *Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002).

## C. Rehabilitation Act of 1973

The Rehabilitation Act of 1973 prohibits federal agencies from discriminating against employees on the basis of a disability. *See* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability[9] . . . shall, solely by reason of her or his disability . . . be subjected to discrimination under . . . any program or activity conducted by any Executive agency . . . ."). A claim of discrimination under the Rehabilitation Act is subject to the same framework that governs discrimination claims under Title VII. *See McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000) (requiring a plaintiff alleging intentional discrimination under the Rehabilitation Act to offer evidence of direct discrimination, or to raise an inference of discrimination under the *McDonnell Douglas* burden-shifting framework); *Barth v. Gelb*, 2 F.3d 1180, 1185 (D.C. Cir. 1993) ("[C]ourts . . . have tended to look to the allocations of the burdens of proof developed for Title VII race and sex discrimination complaints in shaping rules under the Rehabilitation Act."). Under the Rehabilitation Act, direct evidence of discriminatory intent based on an employee's disability can require a trial. *See McGill*, 203 F.3d at 845.

---

[9] A "qualified individual with a disability" includes, *inter alia*, an employee with "a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment." 29 U.S.C. § 705(20)(A)(i). Since Mr. Lowe is deaf and relies on written communication and sign language to interact with co-workers and supervisors, he qualifies as a disabled individual under the statute.

# III. ANALYSIS

Mr. Lowe alleges discrimination on the basis of race, national origin, and disability, retaliation for his prior protected EEO activities, and a hostile work environment. The Court has jurisdiction over this case because Mr. Lowe's claims arise under federal law. *See* 28 U.S.C. § 1331. Venue is proper in this Court pursuant to Title VII's venue provision. *See* 42 U.S.C. § 2000e–5(f)(3). For the reasons set forth below, the Court will grant summary judgment to EPA on Mr. Lowe's claims of discrimination on the basis of race and national origin, a hostile work environment, and those alleged actions which are untimely or insufficient to be materially adverse. Genuine issues of material fact preclude summary judgment as to certain claims of disability discrimination under the Rehabilitation Act and retaliation under Title VII.

## A. Timeliness

Federal employees must first seek counseling on claims of discriminatory or retaliatory employment action by contacting an EEO counselor within forty-five days of the alleged illegal conduct. 29 C.F.R. § 1614.105(a)(1) ("An aggrieved person must initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."). This time period may be extended by the agency or EEOC if an employee shows that (1) he was not informed or aware of the deadline, (2) he did not know and reasonably should not have known that the discriminatory action had occurred, (3) despite due diligence, he was prevented from timely contacting a counselor due to circumstances beyond his control, or (4) for other reasons considered sufficient by the agency or EEOC. *Id.* § 1614.105(a)(2). Unless a plaintiff receives an extension under

the statute, he cannot pursue untimely allegations in federal court. *See, e.g., Greer v. Paulson*, 505 F.3d 1306, 1316 (D.C. Cir. 2007) (affirming the district court's grant of summary judgment where the plaintiff had "failed to show that she exhausted [her Title VII] claim because she offered no evidence that she had met with an EEO counselor within 45 days of the termination of her employment"); *Foster v. Gonzales*, 516 F. Supp. 2d 17, 22 (D.D.C. 2007) (a plaintiff's Title VII claims were untimely where he presented claims for EEO counseling after forty-five days, but failed to request an extension). There is no argument here that Mr. Lowe received an extension of the forty-five day period.

Because Mr. Lowe first made contact with an EEO counselor on November 29, 2007, his allegations concerning events that occurred before October 15, 2007, are untimely. *See Greer*, 505 F.3d at 1316. In other words, Mr. Lowe's requests to Mr. Leopard and Ms. Sterling for a promotion, updated position description, additional GS–14 information security duties, and relocation to the front office are not actionable because they occurred between February and July 2007—more than forty-five days before Mr. Lowe contacted an EEO counselor. However, since Mr. Lowe made the same requests to Director Luttner on October 22, 2007, within forty-five days of November 29, 2007, the Court may consider the earlier alleged facts as background, if relevant, in the specific context of Mr. Luttner's refusal to promote Mr. Lowe to a GS–14 position, revise his position description, and relocate him to the front office.

Mr. Lowe further alleges discrimination based on race, national origin, and disability because EPA "lower[ed] his performance ratings in 2007 to 'Fully Successful,'" Am. Compl. ¶ 27, and because EPA "pa[id] him less than similar[ly]

situated employees," *id.* ¶ 26.  Neither of these alleged acts of discrimination was raised with the EEO Counselor, and Mr. Lowe therefore has failed to exhaust his administrative remedies with respect to these claims.

Finally, Mr. Lowe claims that he suffered discriminatory and retaliatory treatment when EPA managers failed to reward his performance related to information security.  *See id.* ¶ 27.  However, some of the awards that Mr. Lowe alleges he should have received were distributed between 2003 and 2005.  *See* July 11, 2008 EEO Memorandum at 13–14.  These awards were conferred well before Mr. Lowe made contact with an EEO counselor and are not actionable here.  Mr. Lowe also alleges that EPA failed to recognize his contributions with an award in 2008.  Since this allegation was timely presented and exhausted, the Court considers it below, *see infra* at 21–22.

## B.  Waiver

"It is well understood in this Circuit that when a plaintiff files an opposition to a [dispositive motion] addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002); *see CSX Transp., Inc. v. Commercial Union Ins., Co.*, 82 F.3d 478, 482–83 (D.C. Cir. 1996); *Jones v. Air Line Pilots Ass'n*, 713 F. Supp. 2d 29, 39 (D.D.C. 2010).

In briefing, EPA contends that Mr. Lowe did not receive a 2008 performance award because such awards were "almost always reserved for intra-agency teams responsible for major initiatives, and [Mr.] Lowe had not been assigned to any team that received a gold or bronze medal."  Mot. for Summ. J. at 45–46.  EPA also

argues that Mr. Lowe cannot establish a materially adverse action or a denied accommodation based on EPA's failure to provide a sign language interpreter for certain meetings and informal gatherings. *See id.* at 21–22. Mr. Lowe does not respond to either point in his opposition, and he therefore has waived all claims based on his alleged non-receipt of performance awards in 2008 and EPA's alleged refusal to provide a sign language interpreter.

## C. Adverse Action

To support a claim of intentional discrimination, an employee must demonstrate that his employer took an adverse action against him because of his participation in protected EEO activities. "[N]ot everything that makes an employee unhappy" is an adverse action under Title VII. *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)). "Actions short of an outright firing can be adverse within the meaning of Title VII, but not all lesser actions by employers count." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). Some adverse actions are obvious, such as discharge or failure to promote. For those that are less clear, a plaintiff must show an action with adverse consequences "affecting the terms, conditions, or privileges of employment or future employment opportunities . . . ." *Id.* at 1131.

Certain of Mr. Lowe's claims fail to allege adverse employment action to support his charges of intentional discrimination. Specifically, Mr. Lowe asserts race, national origin, and disability discrimination because EPA refused to pay him at the GS–14 level for his information security work, denied his request to transfer to the front office, and refused to assign him additional responsibilities commensurate with a GS–14

grade.  But none of these actions constituted an adverse employment action, and therefore, none are actionable here.

At bottom, the record demonstrates that Mr. Lowe and EPA disagreed about the importance of his information security duties.  But, as specified in the Collective Bargaining Agreement, Mr. Lowe either was required to obtain a vacant GS–14 position or have his GS–13 position upgraded based on an accretion of duties.  *See* Def. Facts ¶ 25.  There were no vacant GS–14 positions at the relevant time, and Mr. Lowe never established that his position should have been elevated based on an accretion of duties.  Therefore, EPA was not required to pay Mr. Lowe as a GS–14 information security specialist.  Even if Mr. Lowe had established that his position should have been at the GS–14 level—which he did not—EPA could have responded by minimizing his GS–14 tasks so as to fit his position within the GS–13 grade.

EPA's failure to accede to Mr. Lowe's requests to pay him at the GS–14 level, assign him additional GS–14 responsibilities, and transfer him to the front office did not impose objectively tangible harm: Mr. Lowe's position and grade remained unaffected and he suffered no financial loss.  *See Russell*, 257 F.3d at 819.  It is true that Mr. Lowe did not receive the employment advantages that naturally accompany a higher grade-level, but Mr. Lowe requested job duties, placement, and pay greater than the maximum permitted by his position.  EPA's refusal to accommodate these requests did not alter the terms or conditions of Mr. Lowe's GS–13 position, and Mr. Lowe has failed to demonstrate an adverse action with respect to these claims.  *See Forkkio*, 306 F.3d at 1131.

Nor can Mr. Lowe demonstrate materially adverse action to support a

retaliation claim based on EPA's refusal to pay him at the GS–14 level, assign him additional GS–14 responsibilities, and transfer him to the front office. A materially adverse action is not necessarily confined to the workplace, as long as "a reasonable employee would have found the challenged action materially adverse[.]" *Burlington N.*, 548 U.S. at 68. "This distinguishes discrimination," which requires adverse action impacting the terms and conditions of employment, "from retaliation, which encompasses a broader sweep of actions." *Bridgeforth v. Jewell*, 721 F.3d 661, 663 n.1 (D.C. Cir. 2013) (internal quotation marks and alterations omitted). Mr. Lowe has not offered sufficient evidence of materially adverse action, as he only proffers evidence that EPA refused to provide a GS-13 employee with the pay, work, and placement of a GS–14 employee. Instead, Mr. Lowe's allegations are more akin to "those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N.*, 548 U.S. at 68. Accordingly, summary judgment will be granted in favor of EPA regarding the refusal to pay Mr. Lowe at the GS–14 level, assign him additional GS–14 duties, and transfer him to the front office.

### D. Race Discrimination

Mr. Lowe alleges disparate treatment due to his race because EPA (1) rated his performance unsatisfactory in 2009; (2) refused to promote him to a GS–14 position or update his position description; (3) subjected his work to heightened scrutiny; (4) placed him on a PIP; (5) claimed that he failed his PIP; and (6) terminated his employment. Am. Compl . ¶¶ 26–27. To establish a *prima facie* case of race discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he suffered an adverse personnel action; and (3) the unfavorable action gives rise to an

inference of discrimination. *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 144 (D.C. Cir. 2008).

Mr. Lowe has not demonstrated any inference of race discrimination with respect to these allegations. While Mr. Lowe is an Asian American who allegedly suffered certain adverse personnel actions, there is no evidence that "the unfavorable action[s] give[] rise to an inference of [race] discrimination." *See id.* The record is devoid of evidence that any EPA manager acted against Mr. Lowe because of his race. Further, Mr. Lowe mentions his race on a single occasion in his opposition and never with respect to an EPA manager's comments or decisions. *See* Opp'n at 4 ("[Mr. Lowe's] race is Asian and his [n]ational [o]rigin is Chinese."). Since Mr. Lowe offers no evidence or argument linking EPA's personnel decisions and adverse treatment to his race, the Court will grant summary judgment to EPA on all of Mr. Lowe's race discrimination claims.

### E.  National Origin Discrimination

As with race discrimination, Mr. Lowe is required to show that EPA's unfavorable personnel actions "give[] rise to an inference of discrimination" because of his national origin. *See Royall*, 548 F.3d at 144. Mr. Lowe is of Chinese descent and he therefore has established his membership in a protected class. But again, Mr. Lowe has failed to present any indicia of discriminatory animus based on this lineage. Mr. Lowe disputes several facts in opposition to summary judgment, including whether he submitted the paperwork required for a desk audit, whether he could have been promoted to a GS–14 position without a desk audit, and whether Mr. Kyle intentionally gave Mr. Lowe assignments that he could not adequately perform to justify the PIP and discharge.

However, none of these factual disputes concerns Mr. Lowe's national origin. To the contrary, Mr. Lowe mentions his Chinese heritage only once and he offers no argument or facts linking his heritage to any EPA decision or action. The Court therefore will grant summary judgment in favor of EPA on all of Mr. Lowe's claims of discrimination on the basis of national origin.

## F. Disability Discrimination

Mr. Lowe further avers that EPA discriminated against him based on his disability when the agency (1) refused to promote him to a GS–14 position; (2) refused to update his position description; (3) rated his performance as unsatisfactory in 2009; (4) subjected his work to heightened scrutiny; (5) placed him on a PIP; (6) claimed that he failed his PIP; and (7) terminated his employment. Am. Compl . ¶¶ 26–27. These claims are covered by the Rehabilitation Act, which is subject to the same analytical framework that applies to discrimination claims under Title VII. *See McGill*, 203 F.3d at 845; *Barth*, 2 F.3d at 1185.

The Court finds that the record includes indicia of direct discrimination based on Mr. Lowe's disability, *i.e.,* deafness. Mr. Lowe offers Mr. Kyle's log of work-related events as evidence of discriminatory intent. On January 6, 2010, during Mr. Lowe's PIP, Mr. Kyle wrote that "[m]ost people try to work around [Mr. Lowe]. When he gets involved, things get more complicated." *See* Pl. Ex. 4 at 2. Mr. Lowe contends, without opposition, that Mr. Kyle refused to learn any sign language during the year and a half that he supervised Mr. Lowe, and that "Mr. Kyle acted as if it was too much trouble to try to understand Mr. Lowe." Opp'n at 8. In addition, in evaluating Mr. Lowe's performance under the PIP, Mr. Kyle criticized Mr. Lowe's handling of the focus

group for the mobile devices project, despite the fact that Mr. Lowe's disability made that task particularly difficult to complete. In his evaluation of Mr. Lowe, Mr. Kyle also criticized Mr. Lowe's failure to attend branch meetings despite the fact that no sign language interpreter was available. *See* Def. Ex. MSPB 4LLL (2009 PARS Interim Rating) [Dkt. 28-13] at 4 ("Like all ISSB employees, [Mr. Lowe] is required to attend each . . . branch meeting, and let me know in advance if he cannot . . . . I've had several discussions with [Mr. Lowe] on the need for him to attend, and participate in, our Branch meetings."). These comments and actions constitute direct evidence of discrimination on the basis of Mr. Lowe's disability. *See Stone*, 442 F. App'x at 569.

At a minimum, the Court finds that Mr. Kyle's comments and actions could be interpreted as instances of disability discrimination. Mr. Lowe's remark that Mr. Lowe made things "more complicated" could have referred to Mr. Lowe's deafness and the accommodations that EPA was required to provide on Mr. Lowe's behalf. The Court cannot resolve these factual issues on summary judgment. As a result, the Court will deny summary judgment as to Mr. Lowe's disability discrimination claims concerning Mr. Lowe's non-promotion to a GS–14 position, limited position description, heightened scrutiny of his work product, unsatisfactory performance ratings, placement on a PIP, alleged unsatisfactory performance under the PIP, and discharge.

### G. Retaliation

Mr. Lowe alleges retaliation based on EPA's heightened scrutiny of his work product, his "Unsatisfactory" performance rating in 2009, EPA's claim that he failed his PIP, and his termination. Am. Compl. ¶ 27. To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in protected activity; (2) he suffered

from a materially adverse act; and (3) a causal connection exists between the protected activity and the employer's act. *Holcomb v. Powell*, 433 F.3d 889, 901–02 (D.C. Cir. 2006); *Forkkio*, 306 F.3d at 1131.

Mr. Lowe engaged in protected activity when he contacted an EEO counselor on November 29, 2008, and then filed his first formal in-agency EEO complaint on February 8, 2008. That complaint was investigated and processed over the course of the following year. Lowe Decl. ¶ 17; *see also* Am. Compl. ¶ 13 ("[I]n March 2009, while Mr. Lowe was litigating his EEO complaint before an Administrative Judge of the EEOC . . . ."). Mr. Lowe filed a second formal EEO complaint on January 7, 2010, alleging six additional incidents of alleged discrimination and retaliation. *See* Am. Compl. ¶ 4(b).

### 1. *Materially Adverse Action*

Mr. Lowe alleges that EPA retaliated against him by rating his performance unsatisfactory on two critical elements in 2009. *See* Opp'n at 19–20. In essence, Mr. Lowe claims that EPA managers, including Mr. Kyle, created a termination case against him by rating him unsatisfactory, and then using these ratings to justify placing him on a PIP. *See id.* at 19 ("As a manager, Mr. Kyle was aware that the only way to terminate an employee without conduct issues was to fail him in his performance review after an unsuccessful PIP . . . ."). Ultimately, Mr. Lowe's performance under the PIP led to his termination in May 2010. Under these circumstances, Mr. Lowe's unsatisfactory performance ratings were materially adverse. It is true that Mr. Lowe's performance ratings did not directly contribute to a financial loss, *cf. Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (noting that "performance reviews

typically constitute adverse actions only when attached to financial harms"), but in the retaliation context, the relevant inquiry is whether an employer's action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination," *see Burlington N.*, 548 U.S. at 68. A jury could find that a reasonable employee would have avoided the EEO process based on unsatisfactory performance ratings, particularly where those ratings led to an agency termination decision. On these facts, the Court finds that Mr. Lowe has raised a genuine issue of material fact regarding whether EPA retaliated against him by giving him unsatisfactory performance ratings.

### 2. Causation

Mr. Lowe also is required to demonstrate a causal nexus between his prior protected EEO activity and EPA's materially adverse actions. A plaintiff may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the [retaliatory] personnel action took place shortly after that activity." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (quoting *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985)); *accord Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that the temporal connection must be "very close" in time).

Mr. Lowe contends that EPA retaliated against him by subjecting his work product to heightened scrutiny. On March 11, 2009, while Mr. Lowe's attorney was involved in litigation before an Administrative Judge in connection with Mr. Lowe's first formal EEO complaint, Mr. Kyle, at Ms. Schlosser's direction, requested that Mr. Lowe increase his branch-related tasks and "evaluate opportunities for adding geospatial capabilities to mobile devices." Def. Facts ¶ 30. The mobile devices project ultimately

led to several adverse work events, including Mr. Lowe's placement on a PIP, the determination that Mr. Lowe failed his PIP, and Mr. Lowe's termination. Because Mr. Kyle assigned the mobile devices project on March 11, 2009, while Mr. Lowe's attorney was litigating his first formal EEO complaint, a reasonable juror could find that Mr. Kyle subjected Mr. Lowe's work product to heightened scrutiny—particularly with respect to the mobile devices project—in retaliation for his involvement in the EEO process.

Mr. Lowe also cites Mr. Kyle's issuance of an "Unsatisfactory" performance rating on November 12, 2009, and imposition of a PIP on December 4, 2009, as retaliatory actions. These actions occurred more than one year after Mr. Lowe filed his first formal EEO complaint. But there is no "bright-line three-month rule" to determine whether a plaintiff has established an inference of causation. *Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012). Instead, courts must "evaluate[] the specific facts of each case to determine whether inferring causation is appropriate." *Id.* at 1358. Mr. Lowe has alleged that Mr. Kyle assigned the mobile devices project in March 2009—while his attorney was taking depositions in connection with his first formal EEO complaint—to justify a series of materially adverse personnel actions that led to his termination. A reasonable juror could find that Mr. Kyle assigned the mobile devices project as a "first step" to terminating Mr. Lowe's employment in retaliation for his protected activities. *See id.* at 1358 (assessing causation from the date of the employer's first step in retaliation).

Finally, Mr. Lowe points to Mr. Kyle's determination that Mr. Lowe failed the PIP on March 2, 2010, and Mr. Battin's termination decision as of May 14, 2010, as retaliatory actions. Mr. Kyle evaluated Mr. Lowe's performance under the PIP

within two months of Mr. Lowe's second formal EEO complaint, and Mr. Battin

terminated Mr. Lowe's employment within four months of that EEO filing.  Accordingly,

the Court will deny summary judgment as to Mr. Lowe's retaliation claims based on

EPA's increased scrutiny of his work product, issuance of unsatisfactory performance

ratings, implementation of the PIP, claim that Mr. Lowe failed to perform under the PIP

adequately, and termination.

### H.  Hostile Work Environment

Mr. Lowe alleges that EPA "discriminated against [him] based . . . upon

his race, national origin, and disability [by] subjecting him to a hostile work

environment."  Am. Compl. ¶ 26.  Mr. Lowe timely included this claim in his first formal

in-agency EEO complaint.  *See* Feb. 8, 2008 EEO Complaint at 6.

"To determine whether a hostile work environment exists, the court looks

to the totality of the circumstances, including the frequency of the discriminatory

conduct, its severity, its offensiveness, and whether it interferes with an employee's work

performance."  *Baloch*, 550 F.3d at 1201.  To prevail on a hostile work environment

claim, a plaintiff must show that his employer subjected him to "'discriminatory

intimidation, ridicule, and insult'" that is "'sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment.'"

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v.

Vinson*, 477 U.S. 57, 65–67 (1986)).

Mr. Lowe's allegations do not support a finding of a hostile work

environment.  Mr. Lowe bases his claim on EPA's assigning him to work "under a

manager who did all that he could to thwart his performance [] under a continuing threat

of being fired" and who "made the [mobile devices project] harder by depriving Mr. Lowe of the means he needed to complete the assignment . . . [and] thereby making him get his information through a focus group."  Opp'n at 4, 40–41.  Mr. Lowe contends that these obstructions created a hostile work environment by increasing the likelihood that he would be terminated for failure to fulfill the terms of the PIP.  *Id.*  EPA responds that, while it is reasonable to assume that any employee placed on a PIP would experience stress, that stress alone does not establish a hostile work environment.  Def. Reply Facts [Dkt. 36-1] at 11.  EPA also points out that "none of the comments made [to Mr. Lowe] during the PIP focused on any of [his] protected statuses.  The criticisms of his performance were not abusive or offensive."  *Id.* at 12.

Although Mr. Lowe alleges that Mr. Kyle thwarted his efforts to succeed, the alleged incidents do not rise to the level of "discriminatory intimidation, ridicule, and insult."  *See Harris*, 510 U.S. at 21.  First, Mr. Lowe has not shown a genuine issue of material fact regarding a hostile work environment based on the mobile devices project. Even if Mr. Kyle did, in fact, frustrate Mr. Lowe's efforts to complete the assignment by requiring him to conduct a focus group, this claim is more appropriately cast as a single instance of alleged disability discrimination.  Mr. Lowe further contends that Mr. Kyle generally frustrated his ability to complete his information security tasks, but the record demonstrates that every EPA manager to consider the issue agreed that Mr. Lowe should have allocated some of his time to ISSB branch duties.  *See* Pl. Facts at 5–6.  While Mr. Lowe eventually was placed on a PIP, the plan only required that Mr. Lowe improve his "performance on each of [the] critical elements . . . [to] at least Minimally Satisfactory," which was defined as signifying that "there is a significant performance-related

problem(s) although the performance has not reached 'unacceptable' in any Critical Element." Pl. Ex. 29 (Performance Improvement Plan) [Dkt. 32-29] at 1.  Contrary to Mr. Lowe's assertions, the PIP did not require perfection, and there is no basis for the Court to find that its implementation was tantamount to discriminatory intimidation, ridicule, and insult.

At best, Mr. Lowe's allegations demonstrate a disagreement with EPA management regarding his allocation of time; they do not show a genuine issue of material fact as to whether EPA created a hostile work environment.  *See Harris*, 510 U.S. at 21.  It is clear that Ms. Schlosser and Mr. Kyle did not place much importance on Mr. Lowe's information security assignments.  Instead, Mr. Lowe's supervisors requested that he focus his attention on branch-related duties and minimize his information security role.  The parties may contest whether EPA was justified in making that determination, but in any event, "Title VII . . . does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'"  *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)).  The Court will grant summary judgment to EPA on Mr. Lowe's hostile work environment claim.

### III.  CONCLUSION

Summary judgment will be granted in favor of EPA on Mr. Lowe's claims of discrimination on the basis of race and national origin under Title VII, as well as the alleged hostile work environment.  Summary judgment also will be granted in favor of EPA on all claims concerning the agency's failure to provide Mr. Lowe with performance awards, failure to provide a sign language interpreter, refusal to pay Mr. Lowe at the GS–

14 level, denial of his request to transfer to the front office, and refusal to assign him additional GS–14 responsibilities.

The following claims remain for trial: (1) disability discrimination under the Rehabilitation Act concerning Mr. Lowe's non-promotion to a GS–14 position, limited position description, the increased scrutiny of his work product, unsatisfactory performance ratings, placement on a PIP, alleged unsatisfactory performance under the PIP, and discharge; and (2) retaliation under Title VII based on EPA's increased scrutiny of Mr. Lowe's work product, issuance of unsatisfactory performance ratings, implementation of the PIP, alleged unsatisfactory performance under the PIP, and termination.  A memorializing Order accompanies this Opinion.


Date: March 26, 2014                                  _____/s/_____
                                                                  ROSEMARY M. COLLYER
                                                                  United States District Judge